## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-10038-ELFENBEIN

**MARY L. BARLEY**,
as the trustee of the Mary L. Barley
Family Trust dated 1/10/1996, *et al.*,

      Plaintiffs,

v.

**ISLAMORADA, VILLAGE OF
ISLANDS**,

      Defendant.

_____/

### ORDER ON DEFENDANT'S MOTION TO DISMISS

**THIS CAUSE** is before the Court on Defendant Islamorada, Village of Islands' Motion to

Dismiss Second Amended and Supplemental Complaint (the "Motion"), ECF No. [32].  In the

Second Amended Complaint, Plaintiffs Mary L. Barley individually ("Barley"), Mary L. Barley

as trustee of the Mary L. Barley Family Trust dated 1/10/1996 ("Trustee"), and Prinston LLC

("Prinston") assert eight claims against Defendant Islamorada, Village of Islands (the "Village").[1]

*See* ECF No. [31].  Three of those claims allege the Village violated Plaintiffs' constitutional

rights, *see* ECF No. [31] at 10–14, while five of them ask for declaratory judgments as to the

---

[1] The Second Amended Complaint's caption and party allegations indicate there are two plaintiffs: (1) Mary L. Barley as trustee of the Mary L. Barley Family Trust dated 1/10/1996 and (2) Prinston LLC.  *See* ECF No. [31] at 1.  The introductory sentence of the Second Amended Complaint, however, indicates there are three plaintiffs: (1) Mary L. Barley individually; (2) Mary L. Barley "as the trustee of the Mary L. Barley Family Trust dated 1/10/1996"; and (3) Prinston, LLC.  *See* ECF No. [31] at 1.  While the remainder of the Second Amended Complaint does not explicitly clarify which is correct, many of the factual allegations relate to Barley's campaign for a seat on the Village Council, *see* ECF No. [31] at 5–6, which she must have run for in her individual capacity.  Because it is the truest interpretation of the Second Amended Complaint as a whole, the Court construes it as having three Plaintiffs. *See, e.g.*, *Campos v. INS*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (noting that the Court "must liberally construe" the factual allegations in the complaint on a motion to dismiss).

rightful ownership of certain property within the Village, *see* ECF No. [31] at 14–23.

In the Motion, the Village argues Plaintiffs do not adequately allege either that the Village violated any of their constitutional rights or that any violation of their constitutional rights resulted from a custom or policy of the Village. *See* ECF No. [32] at 3–12. The Village also argues Plaintiffs are not due declarative relief because a 2005 state court final judgment already determined the ownership of the disputed property, so res judicata and collateral estoppel bar Plaintiffs' claims related to that property. *See* ECF No. [32] at 13–19. For the reasons explained below, the Motion, **ECF No. [32]**, is **GRANTED in part and DENIED in part**.

## I.    BACKGROUND[2]

### A.  The Property

At its core, this case concerns a dispute about the ownership of real property in Islamorada. *See generally* ECF No. [31]. According to Plaintiffs, the disputed property is a 40-foot-wide right of way on the Gulf side of the island that, lengthwise, begins at Avacado Street[3] and ends at Florida Bay (the "Disputed ROW"). *See* ECF No. [31] at 2; ECF No. [31-3]. The Village, "a municipality and political subdivision of the State of Florida situated in Monroe County, Florida" that "was incorporated on or about December 31, 1997," "claims to own" the Disputed ROW. *See* ECF No. [31] at 1–3.

---

[2] The Court takes the facts in this section from the allegations in the Second Amended Complaint, which on a motion to dismiss it must liberally construe and accept as true, *see, e.g.*, *Campos*, 32 F. Supp. 2d at 1343, and from the deeds and maps attached to the Second Amended Complaint, *see Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (noting courts can consider any "documents attached to" the complaint). To the extent the Second Amended Complaint's allegations conflict with the deeds and maps, the deeds and maps govern. *See, e.g.*, *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (noting that when attached exhibits "contradict the general and conclusory allegations of the pleading, the exhibits govern"); *Leader Glob. Sols., LLC v. Tradeco Infraestructura, S.A. DE C.V.*, 155 F. Supp. 3d 1310, 1316 (S.D. Fla. 2016).

[3] Although the Second Amended Complaint refers to this road as "Avocado Street," *see* ECF No. [31] at ¶11, various documents filed in the record indicate that the correct spelling of this road is "Avacado Street," *see* ECF No. [31-3]; ECF No. [1-2] at 25, 49, 94-101, 118, 171, 258.

Both Plaintiff Trustee and Plaintiff Prinston own land bordering the Disputed ROW; specifically, each owns part of a parcel known as Lot 14, which runs lengthwise along the Disputed ROW.  *See* ECF No. [31] at 2; ECF No. [31-3]; ECF No. [31-4].  Plaintiff Trustee owns the part of Lot 14 closest to Florida Bay, which Plaintiff Barley occupies as her primary residence (the "Barley Property").  *See* ECF No. [31] at 2; ECF No. [31-1]; ECF No. [31-3]; ECF No. [31-4].  Plaintiff Prinston, which Plaintiff Barley entirely owns and of which she is the managing member, owns the part of Lot 14 closest to Avacado Street (the "Prinston Property").  *See* ECF No. [31] at 2; ECF No. [31-2]; ECF No. [31-3]; ECF No. [31-4].

The Disputed ROW is part of a right of way originally dedicated to Monroe County in a 1907 plat (the "Platted ROW").[4]  *See* ECF No. [31] at 2–3; ECF No. [31-4].  Lengthwise, the Platted ROW begins at US-1, crosses Avacado Street, and ends at the Florida Bay.  *See* ECF No. [31] at 2–3; ECF No. [31-4].  The undisputed part of the Platted ROW, which runs between US-1 and Avacado Street, is a paved public road called De Leon Avenue.  *See* ECF No. [31] at 2–3; ECF No. [31-3]; ECF No. [31-4].  The 1907 plat indicates the entire Platted ROW, including the Disputed ROW, was intended to become De Leon Avenue, *see* ECF No. [31-4], but the Disputed ROW has never been paved or used as a public road, *see* ECF No. [31] at 3.  Instead, the Disputed ROW "contains mature trees and vegetation" that appear to be at least 20 years old.  *See* ECF No. [31] at 3.

The 1907 plat also indicates there was initially an easement called Bay Path between Florida Bay and Lot 14/the Disputed ROW.  *See* ECF No. [31-4].  Bay Path appears to have been a narrow pedestrian walkway that, widthwise, started a few feet from the shoreline of Florida Bay and ended at Lot 14 or the Disputed ROW.  *See* ECF No. [31-4]; *cf.* ECF No. [31-3].  But Monroe

---

[4] A "plat" is a "map or plan of delineated or partitioned ground; esp., a map describing a piece of land and its features, such as boundaries, lots, roads, and easements." *Plat*, *Black's Law Dictionary* (12th ed. 2024).

County disclaimed the Bay Path easement, which on the 1907 plat ran lengthwise along all the lots between Florida Bay and Avacado Street, in 1948.  *See* ECF No. [31-3]; ECF No. [31-4].





Additionally, sometime after the 1907 plat was recorded, "submerged lands" that used to be within

Florida Bay "adjacent to the shoreline reflected on the" 1907 plat "were filled by persons unknown" (the "Filled Lands"). *See* ECF No. [31] at 3. The resultant Filled Lands, which are no longer underwater, now "adjoin" one side of the Barley Property. *See* ECF No. [31] at 3.

After the Village was incorporated, Monroe County deeded the roads "lying in the new municipality," "including both the paved roadways and rights-of-way," to the Village in "consideration" for the Village assuming "jurisdiction and responsibility over" that property (the "Transfer Deed"). *See* ECF No. [31-5] at 1. The Transfer Deed included a list of all the roads Monroe County gave the Village, which contains the road names, key locations, subdivisions, atlas numbers, mile marker locations, lengths, and widths. *See* ECF No. [31-5] at 2–4. De Leon Avenue and Avacado Street were included in the transfer. *See* ECF No. [31-5] at 2.

### B. Plaintiffs' Use of the Disputed ROW

For "well in excess of 20 years," Plaintiffs "and their predecessors in interest have continuously possessed and exercised dominion and control over all or part of the Disputed" ROW. *See* ECF No. [31] at 4. During that time, "Plaintiffs and/or their predecessors in interest" have made improvements to the Disputed ROW, including the "placement of a concrete dock, installation of fencing, planting and nurturing of vegetation, installation of a brick walkway, placement of boulders/gravel and installation of a propane tank." *See* ECF No. [31] at 4. Plaintiffs and their predecessors in interest have possessed and controlled the Disputed ROW in a way that has been open and notorious, and the Village has known about their possession and control because "Village staff persons" have visited "the property long after the installation of the improvements." *See* ECF No. [31] at 5, 7.

On "more than one occasion," Plaintiffs have sought "to have the Village abandon" the Disputed ROW or to allow Plaintiffs "and/or the other property owners whose properties adjoin"

the Disputed ROW "to have exclusive use and possession of" it.  *See* ECF No. [31] at 5.  The Village has not done so.  In fact, the Village "has always maintained it cannot do so because" the Disputed ROW "terminates on water" and a "local law of the Village" — former Monroe County Code § 16-1(a) (now § 19-1(b)(1)), which will be described in Section I.C below — prohibits abandoning any right of way that terminates on open water.  *See* ECF No. [31] at 5.

### C.  The 2001 State Court Lawsuit[5]

Plaintiffs' predecessor in interest was George Barley, who originally owned both the Barley Property and the Prinston Property (that is, all of Lot 14).  *See* ECF No. [31] at 4.  When he died in 1995, Lot 14 became part of his estate.  *See* ECF No. [31] at 4.  In 2001, Plaintiff Barley filed a state court lawsuit against the Village, in both her individual capacity and her capacity as personal representative of George Barley's estate (the "2001 Lawsuit").  *See* ECF No. [31] at 4; ECF No. [32-1].  The 2001 Lawsuit "sought a determination as to whether" George Barley's estate, Plaintiff Barley, and the owners of Lot 15 (which borders the Disputed ROW on the other side) "had, through the abandonment of the Bay Path by Monroe County, become the owners of the" Disputed ROW.  *See* ECF No. [31] at 4.  The owners of Lots 14 and 15 (the "Owners") brought two claims against the Village: (1) a quiet title claim seeking a decree that they are the "fee simple owner[s]" of the part of the former Bay Path abutting their property; and (2) a declaratory judgment

---

[5] Documents related to the 2001 state court lawsuit, including the amended complaint and 2005 final judgment, are included in the record the Village filed when it removed this case to federal court. *See* ECF No. [1-2] at 94–108; 28 U.S.C. § 1446(a) (noting defendants must file in federal district court "a copy of all process, pleadings, and orders" they received in the removed state court action). The Village also attached the final judgment to the Motion. *See* ECF No. [32-1]. As the Court will further explain in Section II, it can "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if" the document is central to the plaintiff's claim and its authenticity is not challenged. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). And as with documents attached to a complaint, documents attached to a motion to dismiss govern if they contradict the complaint's general conclusory allegations. *See Griffin Indus.*, 496 F.3d at 1206; *Leader*, 155 F. Supp. 3d at 1316.

claim seeking a declaration that Monroe County Code § 16-1(a)[6] does not apply to the former Bay Path or the Disputed ROW. *See* ECF No. [1-2] at 103–08. In support of the quiet title claim, the Owners alleged that Monroe County's 1948 disclaimer of the Bay Path easement, when combined with Florida Statute § 336.12,[7] automatically "vested" title to them in the parts of the former Bay Path that touch their property. *See* ECF No. [1-2] at 103–07. For its part, the Village argued that the former Bay Path became part of the Disputed ROW when Monroe County disclaimed it. *See* ECF No. [1-2] at 106. In support of the declaratory judgment claim, the Owners alleged the Village "may assert" that § 16-1(a) applies to the former Bay Path easement and the Disputed ROW and prevents the Village from abandoning those lands. *See* ECF No. [1-2] at 107–08.

The Monroe County Circuit Court (the "Circuit Court") held a one-day bench trial in May 2005, *see* ECF No. [32-1] at 2, during which it took testimony from Plaintiff Barley and two expert land surveyors, *see* ECF No. [1-2] at 134–39. In the final judgment it issued in September 2005, the Circuit Court framed the issue at "the heart of the dispute" as "the interpretation of an ambiguity alleged to exist" in the 1907 plat. *See* ECF No. [32-1] at 2–3. After considering the trial testimony and looking at the 1907 plat, the Circuit Court concluded the 1907 plat spoke for itself and contained no ambiguity. *See* ECF No. [32-1] at 4. It found that the former Bay Path "was nothing more than an easement" and that Monroe County's abandonment of the easement "simply removed a cloud on the title of all the lots in the" 1907 plat "that it traversed." *See* ECF

---

[6] That section, which has since been reordered, provides in relevant part: "No dedicated and accepted right-of-way in the county shall be abandoned where . . . [t]he right-of-way terminates on a body of open water." Monroe Cnty. Code § 19-1(b)(1); *see also* ECF No. [32-1] at 4.

[7] That section, enacted in 1955, provides: "The act of any commissioners in closing or abandoning any such road, or in renouncing or disclaiming any rights in any land delineated on any recorded map as a road, shall abrogate the easement theretofore owned, held, claimed or used by or on behalf of the public and the title of fee owners shall be freed and released therefrom; and if the fee of road space has been vested in the county, same will be thereby surrendered and will vest in the abutting fee owners to the extent and in the same manner as in case of termination of an easement for road purposes." Fla. Stat. § 336.12.

No. [32-1] at 4.  This included Lot 14, Lot 15, and the Disputed ROW.  *See* ECF No. [32-1] at 8.

With that finding, the Circuit Court in practice determined that Lot 14 has always included the part of the former Bay Path traversing it and that, since Monroe County's 1948 abandonment of the Bay Path easement, Lot 14 had owned that part of the former Bay Path land in fee simple.[8] *See* ECF No. [32-1] at 4.  The practical effect of the Circuit Court's determination on the Disputed ROW was similar: the Disputed ROW has always included the part of the former Bay Path traversing it and the easement had not burdened it since Monroe County abandoned the Bay Path. *See* ECF No. [32-1] at 4.  Having resolved how the abandonment of the Bay Path easement impacted Lot 14 and the Disputed ROW, the Circuit Court turned to the declaratory judgment claim.

The Circuit Court first explained that it considered the declaratory judgment claim a "logical superfluity" because whether Monroe County Code § 16-1(a) applied to the case depended entirely on where the Disputed ROW terminates: § 16-1(a) applied if the Disputed ROW terminates on the Florida Bay and did not apply if the Disputed ROW terminates "at the landward boundary" of the former Bay Path.  *See* ECF No. [32-1] at 4 n.1.  So the Circuit Court answered that question instead, holding that the "reasonable" interpretation of the 1907 plat is that Lot 14 and the Disputed ROW "commence" at Avacado Street and "extend, without interruption, to the shoreline of Florida Bay."  *See* ECF No. [32-1] at 4, 8. This was true even though both parcels had originally been "interrupted by the Bay Path" because, by "[d]rawing the dedication of the Bay Path across the public street right of way," the 1907 plat made clear "the Bay Path was the dominant use and De Leon Avenue the servient use" such that "[i]mprovements to the street were not to interfere with the public's enjoyment of the Bay Path."  *See* ECF No. [32-1] at 5.  And it

_____

[8] The Circuit Court held the same thing as to Lot 15, *see* ECF No. [32-1] at 4, 8, but the Court does not discuss any issues related to Lot 15 because they are irrelevant here.

was supported by the 1907 plat's notation that Lot 14 has "riparian rights," which it would not have had if its boundary did not extend all the way to the water.  *See* ECF No. [32-1] at 5–6.

Because the boundary of Lot 14 extends to Florida Bay, the Circuit Court saw "no reasonable basis to argue" the Disputed ROW "should be treated differently."  *See* ECF No. [32-1] at 6.  It explained that, for the Disputed ROW to receive different treatment, the 1907 plat would have had either to transfer the title to the part of the Bay Path traversing the Disputed ROW (instead of merely creating an easement) or to indicate that the Bay Path and the narrow "strip of land" between the Bay Path and Florida Bay were two separate parcels.  *See* ECF No. [32-1] at 6–7.  But the 1907 plat took neither action. *See* ECF No. [32-1] at 7. Instead, the dedicator "clearly indicated" an "intention to dedicate the Bay Path and the streets to the public" and gave force to his intention by recording the 1907 plat.  *See* ECF No. [32-1] at 7.  Monroe County accepted the dedication by paving and maintaining Avacado Street and part of De Leon Avenue.  *See* ECF No. [32-1] at 7.

All those facts led the Circuit Court to the "inescapable conclusion" that "the lot lines and street boundaries shown on" the waterward side of the Bay Path "reflect the continuation of" Lot 14 and the Disputed ROW.  *See* ECF No. [32-1] at 8.  The Circuit Court also concluded that the Village held title to the paved and maintained parts of Avacado Street and De Leon Avenue by operation of Fla. Stat. § 95.361 but that the "public has an easement to use" the Disputed ROW "for street purposes" that, under § 16-1(a) "cannot be abandoned" and "will continue" until "the street is paved and title goes" to the Village.  *See* ECF No. [32-1] at 7 n.6.  For those reasons, the Circuit Court entered final judgment in favor of the Village,[9] which the Third District Court of Appeal per curium affirmed in 2006.  *See* ECF No. [31] at 4; ECF No. [32-1] at 8.

---

[9] The Circuit Court entered judgment in favor of the Village despite finding, as the Owners wanted, that the owner of Lot 14 (which at that time was George Barley's estate) held fee simple title to the part of the former Bay Path traversing Lot 14.  This is likely because the Circuit Court found that no part of the Disputed ROW belonged to the Owners and that the Village could not abandon the Disputed ROW.

### D.  The 2022 Village Council Election

In 2022, Plaintiff Barley was a candidate for a seat on the Village Counsel, which is its

governing body.  *See* ECF No. [31] at 5.  Late that September, her opponent for the seat, incumbent

councilperson Mark Gregg ("Gregg"), emailed the Village attorney to ask for details about the

2001 Lawsuit.  *See* ECF No. [31] at 5.  Specifically, Gregg asked "how much the Village ha[d]

expended in legal fees and costs" related to Plaintiff Barley's claim that she owns part of the

Disputed ROW, information about which he said "[s]everal citizens" had asked him.  *See* ECF No.

[31] at 5–6.

Gregg used that information "in furtherance of his re-election campaign."  *See* ECF No.

[31] at 6.  In October 2022, Gregg also filed a complaint against Plaintiff Barley with the Florida

Elections Commission ("FEC") in which he "falsely alleged that Barley was responsible for a

political advertisement" that violated Florida law and was "being used to corruptly influence the

election or deceive electors."  *See* ECF No. [31] at 6.  The FEC dismissed the complaint as legally

insufficient.  *See* ECF No. [31] at 6.

During the weeks leading up to the election, "Village employees removed campaign signs

supporting" Plaintiff Barley "from private property while ignoring improperly located campaign

signs for other candidates, one of which was a sitting Village Council member."  *See* ECF No. [31]

at 6.  In the same span of time, another Village Council member, Buddy Pinder ("Pinder"),

"pressured others to remove campaign signs for Barley from their property."  *See* ECF No. [31] at

6.  Gregg ultimately defeated Plaintiff Barley in the November 8 election and retained his seat on

the Village Counsel.  *See* ECF No. [31] at 6.

### E.  The Village's Code Enforcement Against Plaintiff Barley and Others

In October 2022, around the same time Gregg filed his FEC complaint, the Village

demanded Plaintiffs remove their improvements from the Disputed ROW.  *See* ECF No. [31] at 6.

The Village "continued to demand that Barley remove the" improvements after the election

concluded, even though they had existed on the Disputed ROW "for many, many years" with the

Village's knowledge.  *See* ECF No. [31] at 7.  And the Village installed a security camera "to

monitor" Plaintiff Barley's activities, "illegally placing" it on a "utility pole owned by Florida Key

Electric Cooperative."  *See* ECF No. [31] at 7.

 "Gregg and/or Pinder" also "directed and/or demanded Village Staff" to "take

enforcement action against Barley."  *See* ECF No. [31] at 7.  For example, Village staff was

"instructed to remove fencing from the Disputed" ROW and "to place a concrete barricade in front

of" the propane gas tank.  *See* ECF No. [31] at 7.  Gregg asserted that the reason for the concrete

barricade was his "fear for the safety of drivers," even though the Disputed ROW is unpaved and

"had never been used as a public road."  *See* ECF No. [31] at 7.

After Pinder visited the Disputed ROW in March 2023 "with the Village Manager and the

Village Attorney," the Village code compliance department issued Plaintiff Barley a Notice of

Violation in May 2023. *See* ECF No. [31] at 7. The Notice of Violation asserted Plaintiff "Barley

had performed work without obtaining required permits and/or authorizations from the Village,"

including installing a propane tank and pavers in the Disputed ROW.  *See* ECF No. [31] at 7.  The

Village's Code Compliance Hearing Officer found Plaintiff Barley violated the Village code and

in November 2023 "ordered her to obtain after-the-fact building permits for the placement of the

propane tank and pavers in the Disputed" ROW or to remove them. *See* ECF No. [31] at 7–8.

Plaintiff "Barley was targeted" in these ways as "a direct result of her running for the

Village Council." *See* ECF No. [31] at 8. At the same time, other property owners "have made

improvements to" or "utilized rights of way" and other Village property "as if it were their own,"

but the Village ignored those "unauthorized" uses either entirely or "until the improper use was raised by a third party or in this action." *See* ECF No. [31] at 8. Some of these other unauthorized but unpunished uses of Village's rights of way include storing materials; parking vessels, vehicles, and trailers; and placing landscaping, rocks, boulders, or other items on the land. *See* ECF No. [31] at 8–9. Plaintiffs do not identify the other property owners by name, but they list many property addresses where they allege these actions occurred. *See* ECF No. [31] at 8–9.

### F. This Lawsuit

In January 2023, Plaintiff Trustee and Plaintiff Prinston filed a lawsuit against the Village in Monroe County Circuit Court raising five declaratory judgment claims under state law, all related to the Platted ROW, the Disputed ROW, the Barley Property, and the Prinston Property. *See* ECF No. [1] at 1; ECF No. [1-2] at 13–22. Plaintiff Trustee and Plaintiff Prinston amended that state court Complaint in April 2024 to add Plaintiff Barley as a party and three constitutional claims. *See* ECF No. [1] at 1. Because two of those constitutional claims are pursuant to 42 U.S.C. § 1983, the Village removed the case to federal court. *See* ECF No. [1] at 1–2.

Plaintiffs have since amended their claims again in the Second Amended Complaint, which contains eight counts: (1) a selective enforcement claim under § 1983 and the Equal Protection Clause of the Fourteenth Amendment (the "Federal Selective Enforcement claim"); (2) a selective enforcement claim under Article I § 2 of the Florida Constitution (the "State Selective Enforcement claim"); (3) a retaliation claim under § 1983 and the Free Speech Clause of the First Amendment (the "Retaliation claim"); (4) a declaratory judgment claim seeking a declaration that the Platted ROW dedication failed (the "Failed Dedication/Transfer claim"); (5) a declaratory judgment claim seeking a declaration that the Village constructively abandoned the Platted ROW (the "Constructive Abandonment claim"); (6) a declaratory judgment claim seeking a declaration

that the Village cannot enforce the Disputed ROW because it waived its rights by "tacitly" consenting to Plaintiffs' possession and improvements (the "Unenforceability claim"); (7) a declaratory judgment claim seeking a declaration that the Platted ROW does not encompass the Filled Lands (the "Filled Lands claim"); and (8) a declaratory judgment claim seeking a declaration that the Platted ROW does not terminate on a body of water (the "Terminal Location claim").  *See* ECF No. [31] at 10–23.

In the Motion, the Village contends Plaintiffs' constitutional claims (Counts I–III) should be dismissed because they fail to state a claim for relief.  *See* ECF No. [32] at 3–12.  Specifically, the Village argues Plaintiffs fail to allege that a Village policy or custom caused the constitutional violations, which is required to support municipal liability under § 1983.  *See* ECF No. [32] at 3–5 (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)).  The Village also argues that, even if Plaintiffs had properly alleged a policy or custom, they fail to allege any underlying constitutional violation because they have not sufficiently identified comparators or shown differential treatment (as required for their selective enforcement claims) and have not sufficiently identified specific campaign statements Plaintiff Barley made and have not shown that Plaintiff Barley's speech was the but-for cause of the Village's allegedly retaliatory action (as required for the Retaliation claim).[10]  *See* ECF No. [32] at 5–12.  As to the declaratory judgment claims, the Village argues that res judicata and collateral estoppel bar them because the 2001 Lawsuit already decided the ownership and terminal location of the Platted ROW as between the Village and the

---

[10] The Village also argues the Retaliation claim fails because it relies on Barley's individual statements, but she is a party only in her capacity as a trustee. As explained in footnote 1, however, the Court construes the Complaint as having three Plaintiffs, and Barley in her individual capacity is one of them. For that reason, the Court does not discuss this argument. Similarly, because it too relies on the assertion Barley is not an individual plaintiff, the Court also does not address the Village's argument that Barley cannot seek damages for emotional distress and reputational harm as part of Plaintiffs' § 1983 claims.  *See* ECF No. [31] at 11, 14; ECF No. [32] at 12; ECF No. [33] at 6–7; ECF No. [38] at 5–6.

owners of Lot 14.  *See* ECF No. [32] at 13–18.

In their Response to the Motion ("Response"), Plaintiffs argue they need not allege a policy or custom because they "do not assert a *Monell* claim."  *See* ECF No. [33] at 2.  Plaintiffs argue they assert "class of one" equal protection claims, which in their view do not require an official policy, custom, or practice to be the moving force behind the constitutional violations.  *See* ECF No. [33] at 3.  Instead, Plaintiffs argue class of one claims require only "individual instances of differential treatment without a rational basis," not "systemic constitutional violations by local government entities" like *Monell* claims do.  *See* ECF No. [33] at 3–4.  They also argue they have identified comparators by providing the addresses of "property owners, both residential and commercial, who" own property adjacent to a Village right of way, used the Village right of way for personal purposes, and were "never subject to enforcement until this litigation brought attention to the issue."  *See* ECF No. [33] at 4–6.  And Plaintiffs argue res judicata and collateral estoppel do not bar this lawsuit both because the Village must raise those argues in a summary judgment motion, not a motion to dismiss, and because this lawsuit involves different causes of action and different parties.  *See* ECF No. [33] at 6–14.

In its Reply ("Reply"), the Village argues "*Monell* applies to all claims raised against municipalities" under § 1983, even "class of one" equal protection claims.  *See* ECF No. [38] at 1. It also argues Plaintiffs have not explained how the comparators alleged in the Second Amended Complaint are similar to Plaintiffs, how their unauthorized uses are similar to Plaintiffs' uses, or how they have been treated differently than Plaintiffs. *See* ECF No. [38] at 3–4. The Village argues Plaintiffs "effectively conceded" their Retaliation claim by failing to respond to the Village's arguments about it.  *See* ECF No. [38] at 5. The Village notes it is appropriate to raise res judicata and collateral estoppel in a motion to dismiss if the elements are apparent on the face of the

pleadings and there are public documents on which the court may take judicial notice, as is true here.  *See* ECF No. [38] at 6–8.  And it argues it has met the elements of res judicata and collateral estoppel because, in essence, the Plaintiffs in this lawsuit and the 2001 Lawsuit are the same (the owners of Lot 14) and both disputes, though brought through different causes of action, involve rights to the same property.  *See* ECF No. [38] at 8–10.  The Motion is now ripe for review.

## II.   LEGAL STANDARDS

### A.  Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b), a party may move to dismiss a claim on several bases, including a "failure to state a claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted, quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (citation and footnote omitted).  A complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration adopted, quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* (quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (alteration adopted, citation and quotation marks omitted).

"Courts must liberally construe and accept as true allegations of fact in the complaint and inferences reasonably deductible therefrom, but need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by a party." *Campos*, 32 F. Supp. 2d at 1343. When performing this analysis, the court may consider the complaint itself along with any "documents attached to" it "or incorporated in the complaint by reference." *See Saunders*, 766 F.3d at 1270. A "document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents," a court "may consider such a document provided it meets the centrality requirement." *Day*, 400 F.3d at 1276. A document meets the centrality requirement if it is, or the parties' references to the document are, "a necessary part of their effort to make out a claim." *See id.*; *Leader*, 155 F. Supp. 3d at 1315–16 (noting that in "determining whether a document is central to a party's claims, courts consider such factors as" whether "the claims depend on the documents," "the contents of the documents are alleged in the complaint," and "the documents are referred to throughout the complaint").

Along with any documents attached to or referenced in the complaint, a court may also "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day*, 400 F.3d at 1276. "In this context, 'undisputed' means that the authenticity of the document is not challenged." *Id.* And if the documents attached to the complaint or the motion to dismiss "contradict the general and conclusory allegations of the pleading, the" attached documents "govern." *See Griffin*, 496 F.3d at 1206; *id.* at 1205 (noting that "the exhibits attached to the complaint plainly show that" a conclusory allegation in the complaint "is not the case"); *Leader*, 155 F. Supp. 3d at 1316.

Finally, a court may consider "matters of which a court may take judicial notice." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). "The court may judicially notice a fact that is not subject to reasonable dispute because it" either "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999). "Public records are among the permissible facts that a district court may consider." *Tecnoglass, LLC v. RC Home Showcase, Inc.*, 301 F. Supp. 3d 1267, 1271 n.1 (S.D. Fla. 2017) (quotation marks omitted).

Public records that a court may judicially notice include "pleading[s] filed in another court," although "judicial notice may be taken only to establish what those documents contain, not the veracity of their contents." *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364

(S.D. Fla. 2016); *see also United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (noting that a "court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings" (quotation marks omitted)).  They include "another court's order" for "the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation and related filings."  *See In re Delta Res., Inc.*, 54 F.3d 722, 725 (11th Cir. 1995) (quotation marks omitted).  A "court cannot," however, "take judicial notice of factual findings of another court." *Grayson v. Warden, Comm'r, Ala. Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (quotation marks omitted).  "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of issue preclusion would be superfluous." *Id.* (alteration adopted) (quoting *Jones*, 29 F.3d at 1553).

### B. Pleading Requirements

To state a claim for relief, a pleading "must contain" three substantive parts: (1) "a short and plain statement of the grounds for the court's jurisdiction," (2) "a short and plain statement of the claim showing that the pleader is entitled to relief," and (3) "a demand for the relief sought." *See* Fed. R. Civ. P. 8(a).  Those requirements are aimed at ensuring that a complaint contains "sufficient factual matter, accepted as true," *see Iqbal*, 556 U.S. at 678, to both "state a claim to relief that is plausible on its face" and "give the defendant fair notice of what the claim is and the grounds upon which it rests," *see Twombly*, 550 U.S. at 570 (alteration adopted, quotation marks omitted).

### C. Municipal Liability Under 42 U.S.C. § 1983

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . ., subjects, or causes to be subjected, any citizen of the United States . . .

to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  "Thus, to state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a 'person acting under the color of state law.'"  *Ratlieff v. City of Fort Lauderdale*, 748 F. Supp. 3d 1202, 1237 (S.D. Fla. 2024) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)).  Although municipalities can be liable under § 1983, the "Supreme Court has placed strict limitations" on that liability.  *See Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

Indeed, the Supreme Court has made clear that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *See Monell*, 436 U.S. at 694; *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir. 1989) (noting a municipality "may not be held liable solely by virtue of the employment relationship linking it to the offending employee").  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *See Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' — that is, acts which the municipality has officially sanctioned or ordered.").  For that reason, a plaintiff "must identify a municipal policy or custom that caused his injury" to succeed on a § 1983 claim.  *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (alteration adopted, quotation marks omitted). A plaintiff can do that by: "(1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of

law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *See Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022); *Grech*, 335 F.3d at 1329 (noting that plaintiffs can point to either an "officially promulgated" municipal policy or an "unofficial custom or practice" of the municipality "shown through the repeated acts of a final policymaker").

Even though a plaintiff must identify a custom or policy to establish a municipality's § 1983 liability, the custom or policy can be "a single decision by municipal policymakers under appropriate circumstances." *Pembaur*, 475 U.S. at 480.  That is because "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id.* at 481 (footnote omitted).  "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.*

But, of course, "not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Id.* at 483.  Accordingly, "municipal liability under § 1983 attaches where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing

20

final policy with respect to the subject matter in question." *Id.*

## D. Equal Protection under the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.[11] "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923) (quotation marks omitted). "The Equal Protection Clause essentially directs 'that all persons similarly situated should be treated alike.'" *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1311 (11th Cir. 2025) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *see also Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) ("Different treatment of dissimilarly situated persons does not violate the equal protection clause. (citation omitted)). "When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008)

---

[11] Plaintiffs assert a similar claim under the Florida Constitution, which in relevant part provides: "All natural persons, female and male alike, are equal before the law and have inalienable rights. . . . No person shall be deprived of any right because of race, religion, national origin, or physical disability." Fla. Const. art. I, § 2. As the Village notes, *see* ECF No. [32] at 9, the elements of a Florida selective enforcement claim are not materially different from the elements of a federal selective enforcement claim, *see, e.g.*, *Bell v. State*, 369 So. 2d 932, 934 (Fla. 1979) ("[T]o constitute a denial of equal protection, the selective enforcement must be deliberately based on an unjustifiable or arbitrary classification."); *Turner ex rel. Smith v. City of Fort Lauderdale*, No. 05-61635-CIV, 2006 WL 8432526, at *4 (S.D. Fla. Mar. 22, 2006) ("The Florida Supreme Court has held that, pursuant to the Florida Constitution, in order to constitute a denial of equal protection, selective enforcement must be deliberately based on an unjustifiable or arbitrary classification. As noted above, Plaintiffs have not alleged facts that the code was enforced against Plaintiffs to the exclusion of others similarly situated." (citations omitted)).

(quotation marks omitted).

While most equal protection cases claim discrimination based on "a protected class such as race or gender," there is a "less-developed strand of equal protection jurisprudence: the 'class of one' claim." *See Griffin*, 496 F.3d at 1200.  The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiffs raising class-of-one claims do not have to "allege membership in a class or group," *id.*, because "when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised," *Engquist*, 553 U.S. at 602.

"To prove a 'class of one' claim, the plaintiff must show (1) that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral ordinance for the purpose of discriminating against him," *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) — that is, without a "rational basis for the disparate treatment," *Griffin*, 496 F.3d at 1202.  The Eleventh Circuit has "frequently noted that the 'similarly situated' requirement must be rigorously applied in the context of 'class of one' claims." *Leib*, 558 F.3d at 1307.  "Too broad a definition of 'similarly situated' could subject nearly all [municipal] regulatory decisions to constitutional review in federal court and deny [municipal] regulators the critical discretion they need to effectively perform their duties. Conversely, too narrow a definition of 'similarly situated' could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis." *Griffin*, 496 F.3d at 1203.  For that reason, plaintiffs cannot "rely on broad generalities in identifying a comparator." *Id.* at 1204.  "A 'class of one' plaintiff might fail to state a claim by omitting key factual details in

alleging that it is 'similarly situated' to another." *Id.* at 1205.

When a "challenged governmental decision[]" is "one-dimensional" in that it involves "a single answer to a single question," courts can "analyze the 'similarly situated' requirement succinctly and at a high order of abstraction." *Id.* at 1203. But when the government's action is "multi-dimensional, involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time," courts "cannot use a simplistic, post-hoc caricature of the decisionmaking process." *Id.* Instead, courts must evaluate those actions "in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision," making the similarly situated requirement "more difficult to establish." *Id.* at 1203–04; *cf. Engquist*, 553 U.S. at 603 (noting the difficulty of establishing class of one equal protection claims where discretionary authority is exercised "based on subjective, individualized determinations" because in those situations "treating like individuals differently is an accepted consequence of the discretion granted"). "[W]hen plaintiffs in 'class of one' cases challenge the outcome of complex, multi-factored government decisionmaking processes, similarly situated entities must be very similar indeed." *Griffin*, 496 F.3d at 1205 (quotation marks omitted); *see also Chabad Chayil*, 48 F.4th at 1233 ("The entities being compared must be *prima facie* identical in all relevant respects." (quotation marks omitted)).

**E. Retaliation under the First Amendment**

The Free Speech Clause of the First Amendment prohibits States from abridging freedom of speech. U.S. Const. amend. I; *see also Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802 808 (2019) ("[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States."). "The Free Speech Clause not only guarantees the right to free speech, 'but also the right to be free from retaliation by a public official for the exercise of that

right.'" *Ratliff*, 748 F. Supp. 3d at 1244 (quoting *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019)). "First Amendment retaliation is a well-established basis for section 1983 liability." *Id.* at 1250 (quotation marks omitted).

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech." *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011). To "establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." *Id.* If a plaintiff does so, the burden shifts to the defendant to show that it "would have taken the same action in the absence of the protected activity," *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008), "in which case the defendant cannot be held liable," *Castle*, 631 F.3d at 1197.

## F.  Declaratory Judgments

"When a declaratory judgment action has been removed to federal court, it is treated as though it had been filed under the federal declaratory judgment act.  Declaratory judgment acts are procedural in nature and, thus under the Erie doctrine, this Court must apply federal procedural law." *Krauser v. BioHorizons, Inc.*, 903 F. Supp. 2d 1337, 1346 n.6 (S.D. Fla. 2012) (citations omitted). "As a practical matter, however, the elements required under the federal or state declaratory judgment acts are not materially different." *Nirvana Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 589 F. Supp. 2d 1336, 1343 n.1 (S.D. Fla. 2008) (comparing Florida and federal law).

"The Declaratory Judgment Act provides that, 'in a case of actual controversy within its jurisdiction any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'"

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (alterations adopted) (quoting 28 U.S.C. § 2201(a)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127 (citation omitted). "A party seeking a declarat[ory] judgment must allege facts in a complaint from which it appears that there is a substantial likelihood that it will suffer injury in the future." *Nirvana*, 589 F. Supp. 2d at 1343. "Based on the facts alleged, there must be a substantial continuing controversy between two adverse parties." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999).

"The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id.* (citation omitted). Plaintiffs "must assert a reasonable expectation that the injury they have suffered will continue or will be repeated in the future." *Id.* "The remote possibility that a future injury may happen is not sufficient to satisfy the 'actual controversy' requirement for declaratory judgments." *Id.* (citation omitted).

## G. Claim Preclusion and Issue Preclusion[12]

The Supreme Court "has long recognized that the determination of a question directly involved in one action is conclusive as to that question in a second suit." *B & B Hardware, Inc. v.*

_____

[12] The Parties argue these concepts using the terms "res judicata" and "collateral estoppel," *see* ECF No. [32] at 13–18; ECF No. [33] at 7–14, but the Supreme Court has explained that the "preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata,'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Similarly, the Supreme Court has recognized "issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Id.* at 892 n.5; *see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984) (noting issue preclusion "also is referred to as direct or collateral estoppel").

*Hargis Indus., Inc.*, 575 U.S. 138, 147 (2015) (quotation marks omitted). "The idea is straightforward: Once a court has decided an issue, it is forever settled as between the parties, thereby protecting against the expense and vexation attending multiple lawsuits, conserving judicial resources, and fostering reliance on judicial action by minimizing the possibility of inconsistent verdicts." *Id.* (cleaned up). "In short, a losing litigant deserves no rematch after a defeat fairly suffered." *Id.* (quotation marks omitted).

Generally, the "doctrine of claim preclusion instructs that a final judgment on the merits forecloses successive litigation of the very same claim." *Bravo-Fernandez v. United States*, 580 U.S. 5, 9 (2016) (alteration adopted, quotation marks omitted); *see also Taylor*, 553 U.S. at 892 ("Under the doctrine of claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." (quotation marks omitted)). When courts in this Circuit are "asked to give *res judicata* effect to a state court judgment," however, they "must apply the *res judicata* principles of the law of the state whose decision is set up as a bar to further litigation." *Kizzire v. Baptist Health Sys., Inc.*, 441 F.3d 1306, 1308 (11th Cir. 2006); cf. *In re St. Laurent*, 991 F.2d 672, 675–76 (11th Cir. 1993) ("If the prior judgment was rendered by a state court, then the collateral estoppel law of that state must be applied to determine the judgment's preclusive effect."); *In re Harris*, 3 F.4th 1339, 1344 (11th Cir. 2021).

Claim preclusion "applies under Florida law when all four of the following conditions are present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of quality in persons for or against whom claim is made." *Brown v. R.J. Reynolds Tobacco Co.*, 611 F.3d 1324, 1332 (11th Cir. 2010) (quotation marks omitted); *see also Palm AFC Holdings, Inc. v. Palm Beach Cnty.*, 807 So. 2d 703, 704 (Fla. 4th

DCA 2002) (using "capacity" as a synonym for "quality").  "A judgment on the merits rendered in a *former* suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action."  *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 425 (Fla. 2013) (citation omitted).

Similarly, the general rule of issue preclusion is that "when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."  *B & B Hardware*, 575 U.S. at 148 (alteration adopted, citation omitted); *cf. Bravo-Fernandez*, 580 U.S. at 10 (2016) ("[I]ssue preclusion ordinarily bars relitigation of an issue of fact or law raised and necessarily resolved by a prior judgment.").  "The essential elements of issue preclusion under Florida law are that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction." *Brown*, 611 F.3d at 1332 (quotation marks omitted); *see also Wingard v. Emerald Venture Fla. LLC*, 438 F.3d 1288, 1293 (11th Cir. 2006) ("Under Florida law, collateral estoppel will preclude relitigation of an issue when (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies, . . . (4) a final decision has been rendered by a court of competent jurisdiction," and (5) "the litigated issue" was "a critical and necessary part of the prior determination." (quotation marks omitted)). "Identical parties for collateral estoppel purposes . . . includes parties in privity with the parties in the prior litigation. Privity exists where there is a successive relationship to the same property right." *Cmty. Bank of Homestead v. Torcise*, 162 F.3d 1084, 1087 n.7 (11th Cir. 1998) (citation and quotation marks

omitted); *see also Fernandez v. Cruz*, 341 So. 3d 410, 414 (Fla. 3d DCA 2022) (noting "Florida courts have not strictly adhered to the identity of parties requirement in all cases when invoking the doctrines of res judicata or collateral estoppel" (quotation marks omitted)).

## III.  DISCUSSION

As noted above, Plaintiffs assert two constitutional claims under § 1983, one constitutional claim under the Florida Constitution, and five declaratory judgment claims.  *See* ECF No. [31] at 10–23.  The Village moves to dismiss them all.  *See* ECF No. [32] at 3–18.  The Court evaluates each group in turn.

### A.  Constitutional Claims under § 1983 (Counts I and III)

As an initial matter, the Court notes the Parties have a fundamental disagreement about what standard applies when evaluating Plaintiffs' § 1983 claims (Counts I and III).  The Village argues the Court must assess those claims under *Monell*, which requires Plaintiffs to allege that a Village policy or custom was the moving force behind the asserted equal protection and retaliation violations.  *See* ECF No. [32] at 3–5; ECF No. [38] at 1–3.  Plaintiffs, on the other hand, argue they "do not assert a *Monell* claim" because "*Monell* claims target systemic constitutional violations by local government entities, whereas 'class of one' claims pertain to individual instances of differential treatment without a rational basis."  *See* ECF No. [33] at 2–4.  Plaintiffs argue *Monell* claims and class-of-one claims "differ in their focus, scope, and the entities against which they are asserted," so they can assert a class-of-one claim against the Village without also having to satisfy the requirements of *Monell*.  *See* ECF No. [33] at 2–4.  Plaintiffs are mistaken.

While there is no binding precedent explicitly resolving this issue, the weight of authority makes clear that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' — that is, acts which the municipality has officially sanctioned or ordered."

28

*Pembaur*, 475 U.S. at 480.  It is only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.  The Supreme Court has placed these "strict limitations" on municipal § 1983 liability, *Grech*, 335 F.3d at 1329, because "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," *Monell*, 436 U.S. at 694; *Mandel*, 888 F.2d at 791.  For that reason, a plaintiff "must identify a municipal policy or custom that caused his injury" to succeed on a § 1983 claim.  *Gold*, 151 F.3d at 1350 (alteration adopted, quotation marks omitted).

This is true in the traditional equal protection context, as *Monell* itself demonstrates.  "In *Monell,* the plaintiffs challenged the defendant's policy of compelling pregnant employees to take unpaid sick leave before such leave was necessary for medical reasons, on the ground that the policy violated the Due Process or Equal Protection Clauses of the Fourteenth Amendment. Since the defendant was a municipal entity, this Court first addressed whether such an entity was a suable 'person' as that term is used in § 1983." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985); *cf. Brown v. Tony*, No. 0:23-CV-60033-KMM, 2024 WL 4133855, at *7 (S.D. Fla. July 23, 2024) (dismissing without prejudice equal protection claim against Broward County because the complaint contained "no detail describing how any municipal policy, custom, or practice of the County classified or categorized Plaintiff on the basis of any suspect class or in a way that burdened any fundamental right").  The Court sees no principled reason why it would not also be true in the class-of-one claim context, as that kind of claim is simply a subset of equal protection claim jurisprudence.  *See Griffin*, 496 F.3d at 1200.

Indeed, the Eleventh Circuit recently affirmed the dismissal of a § 1983 claim based on an

alleged class-of-one equal protection violation — specifically, that a County School Superintendent's "single decision to prevent" the plaintiff from using the County's school facilities violated the plaintiff's constitutional rights — when the plaintiff "failed to sufficiently allege the elements of *Monell* liability as to" the County School Board. *See Chabad Chayil*, 48 F.4th at 1228–34. The Court did not expressly acknowledge grafting the *Monell* standard onto the class-of-one equal protection standard, but that is in practice what it did when it affirmed the district court's dismissal of a class-of-one claim because the plaintiff "failed to allege sufficient facts to allow the court to infer that any of the superintendent's complained of actions fell within the contours of his final policymaking authority." *See id.* at 1231.

If a plaintiff could establish § 1983 liability over a municipality by alleging only a class-of-one equal protection violation — without the policy, custom, or unconstitutional final decision gloss of *Monell* — then the Court in *Chabad Chayil* would not have had to mention *Monell* at all, let alone analyze the *Monell* issue first and then stop its analysis. The *Chabad Chayil* Court would have instead analyzed the merits of the class-of-one claim and stopped there. But that is not what happened in *Chabad Chayil*. *See* 48 F.4th at 1228–34. Because the Supreme Court has consistently held that municipal liability under § 1983 is strictly limited to constitutional violations caused by a municipal policy, custom, or unconstitutional final decision, *see Tuttle*, 471 U.S. at 817; *Monell*, 436 U.S. at 694; *Grech*, 335 F.3d at 1329; *Gold*, 151 F.3d at 1350; *Mandel*, 888 F.2d at 791, and because the Eleventh Circuit has (recently) affirmed the dismissal of a § 1983 claim based on a class-of-one equal protection violation for failure to sufficiently allege the elements of *Monell* liability, *see Chabad Chayil*, 48 F.4th at 1228–34, the Court concludes that class-of-one equal protection claims against municipalities must allege the elements of both § 1983 and *Monell* to survive dismissal.

Having established that § 1983 class-of-one equal protection claims against municipalities must also allege the elements of *Monell* to state a claim for relief, the Court looks to the allegations of the Second Amended Complaint.  And as Plaintiffs concede in their Response, they "do not assert a *Monell* claim." *See* ECF No. [33] at 2–4.  The Second Amended Complaint contains no allegations that a Village custom or policy was the moving force behind Plaintiffs' Federal Selective Enforcement claim.  *See* ECF No. [31] at 1–11.  It contains no allegations that a decision by a person with final policymaking authority for the Village in the relevant discretionary area was the moving force behind this claim.  *See* ECF No. [31] at 1–11. And it likewise contains no allegations that a Village policy, custom, or decision by an ultimate policymaker was the moving force behind Plaintiffs' Retaliation claim.  *See* ECF No. [31] at 1–14; *Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc. v. City of Miami Beach*, 672 F. Supp. 3d 1286, 1296–1301 (S.D. Fla. 2023) (requiring plaintiff to demonstrate the elements of both First Amendment retaliation and *Monell* to establish § 1983 liability against City).  For that reason, Count I (the Federal Selective Enforcement claim) and Count III (the Retaliation claim) fail to state a claim for relief.

But while Plaintiffs admit they *do not* allege a *Monell* claim, that does not mean they *cannot* allege a *Monell* claim.  *See generally* ECF No. [33].  For that reason, the Court concludes that the best approach is to dismiss Counts I and III without prejudice to allow Plaintiffs a final chance to amend their allegations to include the elements of *Monell* liability, if they can do so in good faith.  Accordingly, **Counts I and III** are **DISMISSED WITHOUT PREJUDICE**.  If Plaintiffs can in good faith amend the Second Amended Complaint to include *Monell* allegations, they must do so **no later than July 25, 2025**.[13]

---

[13] Plaintiffs have conceded that "they are not entitled to seek punitive damages against a municipality," *see* ECF No. [33] at 7 n.1, so their request for punitive damages in Counts I and III, *see* ECF No. [31] at 11, 14, is improper. Because the Court is dismissing those Counts without prejudice, there is no need to strike

**B. Constitutional Claim under the Florida Constitution (Count II)**

Plaintiffs' third constitutional claim arises under Article I, section 2 of the Florida Constitution.  *See* ECF No. [31] at 11–12.  In substance, Plaintiffs' State Selective Enforcement claim in Count II mirrors their Federal Selective Enforcement claim in Count I.  Both claims allege the same core facts, including that the Village: "initiated an enforcement action against Barley for alleged violations of Sections 50-24(a) and 6-61(a) of the" Village Code on May 24, 2023; "unequally and selectively enforced" those facially neutral ordinances against Plaintiff Barley; "intentionally treated Barley differently than other similarly situated persons with no rational basis for the difference in treatment"; initiated the enforcement action "to punish Barley for exercising her fundamentals [*sic*] right of free speech and/or seeking public office" and pursued it "maliciously, in bad faith, and for the sole purpose of injuring Barley"; and caused "Channel 7 news from Miami" to air "factually inaccurate broadcasts and" depict "Barley in a false light thereby causing Barley irreparable harm."  *See* ECF No. [31] at 10–12.

Unlike Plaintiffs' Federal Selective Enforcement claim, however, their State Selective Enforcement claim does not require them to allege the elements of *Monell* liability to successfully state a claim against the Village.  *See Shuttleworth v. Broward Cnty.*, 639 F. Supp. 654, 660 (S.D. Fla. 1986) ("The court finds that the plaintiff may bring a claim directly under Article I, § 2 of the Florida Constitution."); *cf. Lewis v. Arnold*, No. 24-CV-13-MMH-PRL, 2024 WL 5455548, at *10 (M.D. Fla. Dec. 4, 2024) ("[T]here is no state-law analogue to § 1983 for alleged violations of the Florida Constitution. And violations of state law cannot be the basis for § 1983 claims."); *Youngblood v. Fla. Dept. of Health*, 224 F. App'x 909, 913 n.4 (11th Cir. 2007); *Youngblood v.*

---

Plaintiffs' request for punitive damages as the Village seeks. *See* ECF No. [32] at 12.  But the Court notes that, if Plaintiffs refile their § 1983 claims, they should omit a request for punitive damages.

*Florida*, Case No. 01-CV-1449-J-16-MCR, 2005 WL 8159645, at *6 (M.D. Fla. Mar. 17, 2005).

Instead, to state a selective enforcement equal protection claim under Article I, section 2 of the

Florida Constitution, Plaintiffs must allege selective enforcement that was "deliberately based on

an unjustifiable or arbitrary classification." *See, e.g.*, *Bell*, 369 So. 2d at 934 ("[T]o constitute a

denial of equal protection, the selective enforcement must be deliberately based on an unjustifiable

or arbitrary classification.").  Plaintiffs must allege facts showing that the law "was enforced

against [them] to the exclusion of others similarly situated." *See Turner*, 2006 WL 8432526, at *4

("The Florida Supreme Court has held that, pursuant to the Florida Constitution, in order to

constitute a denial of equal protection, selective enforcement must be deliberately based on an

unjustifiable or arbitrary classification. As noted above, Plaintiffs have not alleged facts that the

code was enforced against Plaintiffs to the exclusion of others similarly situated." (citations

omitted)).

      In that way, as the Village notes, *see* ECF No. [32] at 9, the non-*Monell* elements of a

Florida selective enforcement claim are not materially different from the elements of a federal

selective enforcement claim.  Indeed, the Village argues Plaintiffs' State Selective Enforcement

claim fails to state a claim for the same three reasons their Federal Selective Enforcement claim

does: (1) the allegations about comparators are impermissible "broad generalities"; (2) the

allegations about comparators do not adequately explain how the comparators are similar to

Plaintiffs or how the comparators' "unauthorized uses" of the Village's rights of way are similar

to Plaintiffs' use of the Disputed ROW; and (3) the allegations do not demonstrate that Plaintiffs

have been treated differently than those comparators.  *See* ECF No. [32] at 6–8.  The Court agrees.

      As an initial matter, the Court notes that the Village's code enforcement decisions are not

straightforward applications of a one-dimensional rule that involve a single answer to a single

question.  *See Griffin*, 496 F.3d at 1203.  Instead, they are multi-dimensional decisions involving varied criteria applied over an extended period of time.  *See id.*  For that reason, the similarly situated requirement will be "more difficult" for Plaintiffs "to establish."  *Id.* at 1203–04.  More detail about alleged comparators will be required, as the Court must evaluate the Second Amended Complaint's allegations to see if — looking to the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in bringing a code enforcement action — Plaintiffs have adequately alleged they were intentionally treated differently from others similarly situated with no rational basis for the difference in treatment.  *See id.* at 1203–05; *Olech*, 528 U.S. at 564; *Engquist*, 553 U.S. at 603; *Chabad Chayil*, 48 F.4th at 1233.

With that context, the Court moves to the Second Amended Complaint's allegations.  First, the Second Amended Complaint's allegations about comparators are overbroad because they do not include precise enough details.  In fact, the allegations are so broad that they could include everyone in Islamorada: in one paragraph, Plaintiffs refer to "[o]ther businesses and/or property owners and persons," which, when distilled, amounts to the immensely general "other people." *See* ECF No. [31] at 8.  Read in the light most favorable to Plaintiffs, the Court focuses on the Second Amended Complaint's allegation that some of the general group are other property owners, a category that shares at least one trait with Plaintiffs.  But the Second Amended Complaint does not allege the comparators' names or any additional characteristics about most of these other property owners or their uses of the Village's rights of way that would allow the Court to conclude that they are "*prima facie* identical" to Plaintiffs "in all relevant respects."  *See Chabad Chayil*, 48 F.4th at 1233 (quotation marks omitted).

The only additional characteristic the Second Amended Complaint alleges about one subset of comparators is that they are "private owners whose property adjoins the Village rights of

way." *See* ECF No. [31] at 9.  This is, of course, a closer match for Plaintiffs, who are property owners with land adjoining the Disputed ROW.  But the Second Amended Complaint fails to allege anything more distinct about this subset or the larger group, like whether any of them ran for municipal office, as Plaintiff Barley did, or otherwise voiced views in opposition to municipal leaders that, under Plaintiffs' theory, would have singled them out for targeting too.  *See generally* ECF No. [31].

As for the comparable uses, the Second Amended Complaint alleges other property owners have utilized or made improvements to the Village's rights of way and other property as if it were their own.  *See* ECF No. [31] at 8.  And it alleges that some of these uses include placing landscaping, rocks, and boulders on the rights of way, *see* ECF No. [31] at 8–9, which aligns with Plaintiffs' "planting and nurturing of vegetation, installation of a brick walkway," and "placement of boulders/gravel," *see* ECF No. [31] at 4.  But it does not allege, for example, whether any of the comparator properties (or the adjoining rights of way) are waterfront, like Plaintiffs' property and the Disputed ROW are, or whether any comparator installed fencing or stored propane or other dangerous substances on the rights of way, like Plaintiffs did.  *See generally* ECF No. [31].

Instead, Plaintiffs allege that other unauthorized but unpunished uses of Village rights of way include storing materials and parking vessels, vehicles, and trailers, *see* ECF No. [31] at 8–9, none of which are part of the improvements or uses Plaintiffs allege they and their predecessors in interest installed, *see* ECF No. [31] at 4.  Simply put, Plaintiffs' allegations about comparable property owners and their uses of Village rights of way have "omitt[ed] key factual details" that are necessary to establish that those people or uses are similarly situated to them — particularly in the class-of-one context, *see Griffin*, 496 F.3d at 1205, where the similarly situated requirement must be rigorously applied, *see Leib*, 558 F.3d at 1307.  Comparing what Plaintiffs allege other

property owners have done with what Plaintiffs allege they have done leads the Court to conclude, based on the broadly pled allegations in the Second Amended Complaint, that the groups are more dissimilarly situated than similarly situated.  And different treatment of dissimilarly situated persons does not violate equal protection.  *See Griffin*, 496 F.3d at 1207.

Second, even assuming Plaintiffs had alleged comparators or uses of the Village's rights of way that were "very similar indeed," *see id.*, 496 F.3d at 1205, the Second Amended Complaint's allegations do not demonstrate Plaintiffs have been treated differently than those comparators.  *See generally* ECF No. [31]. Although Plaintiffs allege the Village has ignored some comparators' "unauthorized" uses entirely, they allege the Village has brought code enforcement actions against others once their "improper use was raised by a third party or in this action." *See* ECF No. [31] at 8. That treatment echoes the enforcement actions directed at Plaintiffs, which did not arise until Councilman Gregg's email raised their allegedly improper use of the Disputed ROW. *See* ECF No. [31] at 5–8. As to the Village's treatment of Plaintiffs and their broadly identified comparators, then, the Second Amended Complaint's allegations actually tend to show similarly situated people being treated similarly.

In sum, the Second Amended Complaint relies on broad generalities when identifying comparators and comparator uses and, by doing so, omits key factual details from its similarly situated allegations. *See Griffin*, 496 F.3d at 1203–05.  The Second Amended Complaint also fails to adequately allege Plaintiffs were treated differently than similarly situated people with no rational basis for the differential treatment.  For those reasons, Plaintiffs have failed to state a class-of-one equal protection claim under Article I, § 2 of the Florida Constitution.  *See id.*  Accordingly, **Count II** is **DISMISSED WITHOUT PREJUDICE**.  If Plaintiffs can in good faith amend the Second Amended Complaint to include additional allegations about similarly situated property

owners, similarly situated property uses, or differential treatment to supplement their constitutional claims, they must do so **no later than July 25, 2025.**

## C. Declaratory Judgment Claims (Counts IV–VIII)

Plaintiffs' remaining five claims all ask for declaratory judgments outlining either the boundaries of or the Parties' respective rights to the Platted ROW, the Disputed ROW, and the Filled Lands. *See* ECF No. [31] at 14–23. The Village moves to dismiss Plaintiffs' declaratory judgment claims based on res judicata and collateral estoppel, contending that the 2001 Lawsuit already decided the ownership and terminal location of the Platted ROW as between the Village and the owners of Lot 14. *See* ECF No. [32] at 13–18. The Village argues those already-decided issues encompass the rights Plaintiffs seek to have determined in the declaratory judgment claims. *See* ECF No. [32] at 13–18. Plaintiffs respond that res judicata and collateral estoppel do not bar this lawsuit because it involves different causes of action and different parties than did the 2001 Lawsuit.[14] *See* ECF No. [33] at 6–14. The Village argues the parties in both lawsuits are in essence the same (the owners of Lot 14 and the Village) and both disputes, though brought through different causes of action, involve rights to the same property. *See* ECF No. [38] at 8–10.

---

[14] Plaintiffs also argue the Village cannot raise res judicata and collateral estoppel in a motion to dismiss and must wait until the summary judgment stage. *See* ECF No. [33] at 6–14. The Village responds it is appropriate to raise res judicata and collateral estoppel in a motion to dismiss if the elements are apparent on the face of the pleadings and there are public documents on which the court may take judicial notice, as is true here. *See* ECF No. [38] at 6–8. The Court agrees with the Village. *See Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982) ("[A] party may raise a res judicata defense by motion rather than by answer where the defense's existence can be judged on the face of the complaint."); *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (noting public records a court may judicially notice include "pleading[s] filed in another court," although "judicial notice may be taken only to establish what those documents contain, not the veracity of their contents"). Plaintiffs included allegations about the 2001 Lawsuit in the Complaint, *see* ECF No. [31] at 4–5; documents related to the 2001 Lawsuit (including the amended complaint and 2005 final judgment) and the pre-removal 2023 state court lawsuit are part of the record the Village filed when it removed this case to federal court, *see* ECF No. [1-2] at 94–108; 28 U.S.C. § 1446(a) (noting defendants must file in federal district court "a copy of all process, pleadings, and orders" they received in the removed state court action); and the Court can take judicial notice of other documents filed in those lawsuits, *see* Civil Docket Search, Monroe Cnty. Cir. Ct. Clerk, https://cr.monroe-clerk.com/Attorney/SearchCriteria?caseType=CV (last visited July 11, 2025).

The Declaratory Judgment Act allows courts to "declare the rights and other legal relations" between the parties as long as "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 126–27 (citation omitted); *see also Malowney*, 193 F.3d at 1347; *Nirvana*, 589 F. Supp. 2d at 1343. That standard is met here: the controversy is substantial because it involves the rights to property the Village claims is reserved for the benefit of the public, the Parties have adverse legal interests because both claim ownership (or at least possession) rights to the same property, and the controversy is of sufficient immediacy and reality because Plaintiffs have made improvements to the disputed property that the Village has ordered them to alter or remove under the threat of financial penalty. *See* ECF No. [31] at 15–23. So the Court may issue a declaratory judgment if it finds one appropriate. *See* 28 U.S.C. § 2201(a).

To prove claim preclusion under Florida law, the Village must show that four things are identical: (1) the thing sued for; (2) the cause of action, including all issues actually litigated and any issues that could have been litigated; (3) the parties to the action; and (4) the capacity in which the parties appear. *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704. And to prove issue preclusion under Florida law, the Village must show: (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies; (4) a final decision has been rendered by a court of competent jurisdiction; and (5) the litigated issue was a critical and necessary part of the prior determination. *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332. Identical parties for preclusion purposes includes parties in privity with the parties in the prior litigation, and privity exists where there is a successive relationship to the same property right. *See Torcise*, 162 F.3d at 1087 n.7; *Fernandez*, 341 So. 3d at 414.

The Parties' difference of opinion here pertains to two elements common to both kinds of preclusion: the identity/capacity of the parties and the identity of the causes of action.  *See* ECF No. [32] at 13–18; ECF No. [33] at 6–14; ECF No. [38] at 8–10.  Plaintiffs are correct that, at the surface level, the parties and claims are different.  The relevant parties in the 2001 Lawsuit were Barley, George Barley's estate, and the Village, *see* ECF No. [31] at 4; ECF No. [32-1], while the Parties here are Barley, Trustee, Prinston, and the Village, *see generally* ECF No. [31].  The relevant claims in the 2001 Lawsuit were a claim to quiet title to the part of the Bay Path abutting Lot 14 and a declaratory judgment claim about the applicability of Monroe County Code § 16-1(a), *see* ECF No. [1-2] at 103–08, while the relevant claims here are five declaratory judgment claims about the boundaries of or the Parties' respective rights to the Platted ROW, the Disputed ROW, and the Filled Lands, *see* ECF No. [31] at 14–23.

Looking below the surface level and beyond the labels, however, reveals important nuance.  Though some of the relevant named plaintiffs in the two lawsuits are different, those nominally different plaintiffs are in privity with each other.  First, and obviously, Barley in her individual capacity is the same in both lawsuits. *See* ECF No. [31]; ECF No. [32-1]. Second, and less obviously, the 2001 Lawsuit's plaintiff (George Barley's estate) and the other Plaintiffs here (Trustee and Prinston) are, at a higher level of abstraction, the same: both groups were, at the relevant time, the owners of Lot 14.  *See* ECF No. [31] at 4; ECF No. [32-1] at 3.  As already explained, privity exists where there is a successive relationship to the same property right. *See Torcise*, 162 F.3d at 1087 n.7; *Fernandez*, 341 So. 3d at 414.  And parties in privity are considered identical for preclusion purposes. *See Torcise*, 162 F.3d at 1087 n.7; *Fernandez*, 341 So. 3d at 414. For that reason, the Court agrees with the Village that the Parties are identical as those terms are defined in the preclusion context.  *See* ECF No. [38] at 8–10.

That leaves only the question of whether the claims or issues are identical for preclusion purposes. As noted above, when comparing claims, the Court must consider what issues the parties actually litigated/are litigating *and* any issues that could have been litigated during the earlier, potentially preclusive lawsuit. *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704. And though the names of the claims in the 2001 Lawsuit and this lawsuit are different, the Court agrees with the Village that the issues in the 2001 Lawsuit — both actually litigated and available to be litigated — are identical (as that term is defined in the preclusion context) to the issues litigated here. *See* ECF No. [38] at 8–10; *Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.

### 1. Terminal Location claim (Count VIII)

Starting with the clearest match between the claims and issues litigated (or that were available for litigation) in the 2001 Lawsuit and those at issue here, Plaintiffs' Terminal Location claim asks this Court to declare that the Platted ROW does not include the Filled Lands or terminate on a body of water. *See* ECF No. [31] at 23. And in the 2001 Lawsuit, the Circuit Court explicitly held that the Disputed ROW, which is the unpaved part of the Platted ROW, "extend[s], without interruption, to the shoreline of Florida Bay." *See* ECF No. [32-1] at 4, 8. It likely surprises no Floridian to learn that the general definition of "shoreline" is "the line where a body of water and the shore meet," *see Shoreline*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/shoreline (last visited July 11, 2025), or that the general definition of "shore" is "the land bordering a usually large body of water," *see Shore*, *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/shore (last visited July 11, 2025). Nor should it surprise Plaintiffs that, given those general definitions, the only reasonable interpretation of the Circuit Court's holding is that the Platted ROW terminates on a body of water — namely,

Florida Bay.  *See* ECF No. [32-1] at 4, 8.

That means, as to the endpoint of the Platted ROW, the 2001 Lawsuit decided the exact issue Plaintiffs ask this Court to declare.  So unless the addition of the Filled Lands inquiry changes that result, res judicata will bar Plaintiffs' Terminal Location claim.  Implicit in the Circuit Court's holding that the Disputed ROW (and therefore the Platted ROW) extends without interruption to the shoreline of Florida Bay is a holding that any land within the Platted ROW that was not underwater in 2001 is part of the Platted ROW.  So if the Filled Lands existed in 2001, the 2001 Lawsuit decided that they are part of the Platted ROW.

Plaintiffs allege the Filled Lands went from submerged to surface when unknown persons filled them in sometime "after the recording of the" 1907 plat.  *See* ECF No. [31] at 3.  Plaintiffs do not allege, more specifically, that the Filled Lands went from submerged to surface sometime after the 2001 Lawsuit. *See generally* ECF No. [31]. Two arguments in Plaintiffs' Response indicate that the level of specificity in their allegations about when the Filled Lands were created was intentional.  First, Plaintiffs argue that "references to the shoreline in that case were little more than a reference to the shoreline reflected on the [1907] plat, which was no longer in fact a shoreline *due to the filled lands*."  *See* ECF No. [33] at 14 (emphasis added).  That argument acknowledges that the Filled Lands existed in 2001.[15] Second, Plaintiffs explicitly state that "Counts V and VI" are "based on facts occurring after the conclusion of the 2001" Lawsuit, but they do not say the same thing about Count VIII.  *See* ECF No. [33] at 14.  If the Filled Lands did not exist in 2001, Plaintiffs would have included Count VIII as being based on facts occurring after the conclusion of the 2001 Lawsuit.

---

[15] Plaintiffs give no support for their assumption that the Circuit Court meant the shoreline drawn on the 1907 plat instead of the shoreline of Florida Bay in 2001, *see* ECF No. [33] at 14, and the Court sees none in the 2005 final judgment, *see* ECF No. [32-1]. The Court thus interprets "shoreline" in the 2005 final judgment to have its typical meaning instead of being limited to a line on a century-old plat.

Although Plaintiffs assert that "questions involving ownership of the" Filled Lands "and whether they were part of the" Platted ROW were "not pled, submitted for determination or determined in the 2001" Lawsuit, *see* ECF No. [33] at 14, their predecessors in interest could have litigated those questions in the 2001 Lawsuit because the Filled Lands existed at that time.  And identity of claims in the preclusion context encompasses any issues that could have been litigated during the earlier lawsuit but were not.  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.  But even assuming the Filled Lands did not exist in 2001, the Circuit Court's use of the word "shoreline" — a descriptor built to reflect that the precise location of the water in relation to the land fluctuates in both the short term (tides) and the long term (erosion) — to describe the endpoint of the Platted ROW instead of latitudinal coordinates or a fixed landmark supports interpreting its holding as intentionally broad so as to cover any future changes to where the shoreline begins.  For those reasons, the Court concludes the 2001 Lawsuit decided the Filled Lands are part of the Platted ROW or, at minimum, could have decided that question because Plaintiffs could have litigated it in the 2001 Lawsuit.

Because the 2001 Lawsuit decided that Florida Bay is the endpoint of the Platted ROW, the 2001 Lawsuit decided the exact issue Plaintiffs ask this Court to declare.  So claim preclusion bars Plaintiffs' Terminal Location claim (Count VIII).  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.  Similarly, because "the litigated issue was a critical and necessary part of the" 2001 Lawsuit, issue preclusion also bars Plaintiffs' Terminal Location claim (Count VIII).  *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332.  Accordingly, the Motion, **ECF No. [32]**, is **GRANTED as to Count VIII**, which is **DISMISSED WITH PREJUDICE**.

**2. Filled Lands claim (Count VII)**

Turning next to a closely related claim, Plaintiffs' Filled Lands claim asks the Court to declare the Platted ROW does not include the Filled Lands.  *See* ECF No. [31] at 21.  Plaintiffs allege the Village believes the Platted ROW includes the part of the Filled Lands that are "outside the boundaries of the Platted ROW" in the direction of Florida Bay.  *See* ECF No. [31] at 20.  Plaintiffs, on the other hand, allege either the State of Florida or Plaintiff Trustee owns the Filled Lands.  *See* ECF No. [31] at 20.  And Plaintiffs allege the Filled Lands went from submerged to surface when unknown persons filled them in sometime "after the recording of the" 1907 plat, not after the 2001 Lawsuit.  *See* ECF No. [31] at 3.

As discussed above, Plaintiffs' allegations and arguments acknowledge the Filled Lands existed at the time of the 2001 Lawsuit.  And as explained above, the 2001 Lawsuit decided the Filled Lands are part of the Platted ROW because that finding is implicit in the Circuit Court's holding that the Disputed ROW (and therefore the Platted ROW) extends without interruption to the shoreline of Florida Bay.  But again, and importantly, whether the Filled Lands existed in 2001 or they did not, Plaintiffs' predecessors in interest could have litigated "questions involving ownership of the" Filled Lands "and whether they were part of the" Platted ROW in the 2001 Lawsuit.  *See* ECF No. [33] at 14.

Because identity of claims in the preclusion context encompasses any issues that could have been litigated during the earlier lawsuit but were not, claim preclusion bars Plaintiffs' Filled Lands claim (Count VII) either way.  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.  Similarly, because "the litigated issue was a critical and necessary part of the" 2001 Lawsuit — the Circuit Court decided the endpoint of the Platted ROW, and the presence or absence of the Filled Lands impacted where the Platted ROW ended even if

the Circuit Court did not specifically mention them — issue preclusion also bars Plaintiffs' Filled

Lands claim (Count VII). *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332. Accordingly,

the Motion, **ECF No. [32]**, is **GRANTED as to Count VII**, which is **DISMISSED WITH**

**PREJUDICE**.[16]

### 3. Failed Dedication/Transfer claim (Count IV)

Moving to another related claim, Plaintiffs' Failed Dedication/Transfer claim asks the

Court to declare that Monroe County and the Village "never accepted the dedication of the Platted

ROW" or that, if they did, the dedication "failed as the Platted ROW was not utilized for its

intended purpose . . . as a public road." *See* ECF No. [31] at 14–16. Plaintiffs also ask the Court

to declare that Monroe County "did not convey the Platted ROW to the Village" in the Transfer

Deed and instead conveyed only "the paved portion of De Leon Ave. that existed at the time of

the conveyance" in 1999. *See* ECF No. [31] at 15–16; ECF No. [31-5]. Finally, Plaintiffs ask this

Court to declare the Village "has no right" to possess or use the Platted ROW and to enjoin the

Village from removing the improvements or "dispossessing" Plaintiffs from the Disputed ROW.

*See* ECF No. [31] at 16.

In the 2001 Lawsuit, the Circuit Court explicitly held it is "clear that Monroe County

accepted the dedication" of "the streets to the public." *See* ECF No. [32-1] at 7. The Circuit Court

explained that Monroe County demonstrated its acceptance by paving and maintaining Avacado

Street and part of De Leon Avenue. *See* ECF No. [32-1] at 7. The Circuit Court also concluded

the Village holds title to the paved and maintained parts of Avacado Street and De Leon Avenue,

---

[16] Count VII includes no allegations about the ownership of the part of the Filled Lands outside the boundary
lines of Lot 14 toward Florida Bay, *see* ECF No. [31] at 20–21, despite Plaintiffs seemingly including that
land in their original definition of the term "Filled Lands," *see* ECF No. [31] at 3. For that reason, the Court
does not make any findings or holdings as to the part of the Filled Lands outside the boundary lines of Lot
14 toward Florida Bay.

while the "public has an easement to use" the Disputed ROW "for street purposes" that, under § 16-1(a) "cannot be abandoned" and "will continue" until "the street is paved and title goes" to the Village.  *See* ECF No. [32-1] at 7 n.6.  Those determinations conclusively resolve the issues Plaintiffs raise in their Failed Dedication/Transfer claim.

First and obviously, the Circuit Court held that Monroe County accepted the dedication of the streets to the public, *see* ECF No. [32-1] at 7, which not only remedies Plaintiffs' alleged "doubt of their rights" as to the Platted ROW but also precludes the Court from declaring the Village never accepted the dedication.  *See* ECF No. [31] at 15.  Second, the Circuit Court found the Village holds title to the paved and maintained part of De Leon Avenue and the public has an easement to use the unpaved part of De Leon Avenue (that is, the Disputed ROW) for street purposes that cannot be abandoned, *see* ECF No. [32-1] at 7 n.6, which precludes the Court from declaring either that the dedication to the Village failed or that the Transfer Deed did not convey the Platted ROW to the Village, *see* ECF No. [31] at 15–16.  And certainly, if the Village owns the paved part of the Platted ROW and the public has an unabandonable easement in the unpaved part of the Platted ROW, the Court cannot declare the Village has no right to possess or use the Platted ROW and should not enjoin the Village from removing the improvements or dispossessing Plaintiffs from the Disputed ROW.  *See* ECF No. [31] at 16.  Even if such a declaration were aligned with the Circuit Court's findings, which it is not, the Court still could not render it because it encompasses an issue Plaintiffs could have litigated in the 2001 Lawsuit but did not.

Because Plaintiffs' Failed Dedication/Transfer claim raises issues that either were litigated or could have been litigated during the 2001 Lawsuit but were not, it meets the definition of identity of claims in the preclusion context.  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.  For that reason, claim preclusion bars Plaintiffs' Failed

Dedication/Transfer claim (Count IV).  Similarly, because "the litigated issue was a critical and necessary part of the" 2001 Lawsuit, issue preclusion also bars Plaintiffs' Failed Dedication/Transfer claim (Count IV).  *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332. Accordingly, the Motion, **ECF No. [32]**, is **GRANTED as to Count IV**, which is **DISMISSED WITH PREJUDICE**.

### 4.  Constructive Abandonment claim (Count V)

In their Constructive Abandonment claim, Plaintiffs allege the Village "abandoned the Platted ROW through its failure to improve," maintain, or "assert dominion and control over" it.[17] *See* ECF No. [31] at 16.  But as just discussed, the Circuit Court explicitly held in the 2001 Lawsuit that the Village holds title to the paved and maintained part of De Leon Avenue and the public has an easement to use the Disputed ROW for street purposes.  *See* ECF No. [32-1] at 7 n.6.  The Circuit Court also held that the public's easement to use the Disputed ROW cannot be abandoned because § 16-1(a), which is now § 19-1(b)(1), forbids the Village from abandoning a right of way that terminates on a body of open water.  *See* ECF No. [32-1] at 4, 7 n.6; Monroe Cnty. Code § 19-1(b)(1).  Because the Disputed ROW cannot be abandoned, the Circuit Court held it will continue until the Disputed ROW is paved as a road, at which point title will automatically vest in the Village pursuant to Fla. Stat. § 93.361.  *See* ECF No. [32-1] at 7 n.6.

Those determinations conclusively resolve the issues Plaintiffs raise in their Constructive Abandonment claim.  Clearly, the Circuit Court's holdings that that the Village owns the paved part of De Leon Avenue, the public has an easement to use the unpaved part of De Leon Avenue, and the public's easement cannot be abandoned, *see* ECF No. [32-1] at 7 & n.6, settle the question

---

[17] Although Plaintiffs do not refer in Count V to the Disputed ROW, *see* ECF No. [31] at 16–17, the Complaint's other allegations make clear that the only part of the Platted ROW the Village has not improved and maintained is the unpaved part, which is how Plaintiffs define the Disputed ROW, *see* ECF No. [31] at 2–3.

of whether the Village has abandoned the Platted ROW.  Even if the Court were to agree with Plaintiffs that the Village failed to improve, maintain, or assert dominion and control over the Platted ROW, § 19-1(b)(1) contains no exceptions to its express rule prohibiting the abandonment of Monroe County rights of way that terminate on a body of open water.  *See* Monroe Cnty. Code § 19-1(b)(1).  Because the abandonment of waterfront rights of way is governed by a County Code section, nothing the Village has done or failed to do has abandoned the Disputed ROW or the Platted ROW — in truth, nothing the Village ever does or fails to do could abandon them.

For that reason, it does not matter that Plaintiffs' Constructive Abandonment claim is "based on facts occurring after the conclusion of the 2001" Lawsuit.  *See* ECF No. [33] at 14.  The Circuit Court's determination that the Disputed ROW cannot be abandoned was not based on the "facts" of the Village's use or nonuse; it was based on the law, specifically § 19-1(b)(1)'s prohibition of abandoning any right of way that terminates on open water.  *See* ECF No. [32-1] at 7 n.6.  Like Counts IV, VII, and VIII, Plaintiffs' Constructive Abandonment claim is resolved by an issue that was litigated (or, at minimum could have been litigated) during the 2001 Lawsuit. Plaintiffs' Constructive Abandonment claim is identical, as that term is defined in the preclusion context, so claim preclusion bars Plaintiffs' Constructive Abandonment claim (Count V).  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704. Similarly, because "the litigated issue was a critical and necessary part of the" 2001 Lawsuit, issue preclusion also bars Plaintiffs' Constructive Abandonment claim (Count V).  *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332.  Accordingly, the Motion, **ECF No. [32]**, is **GRANTED as to Count V**, which is **DISMISSED WITH PREJUDICE**.

**5.  Unenforceability claim (Count VI)**

Finally, Plaintiffs' Unenforceability claim asks the Court to declare the Village "has

47

waived its rights to possess" and use the Disputed ROW "for its benefit or for the benefit of the public or others."  *See* ECF No. [31] at 18.  Plaintiffs also ask the Court to declare the Village is estopped from removing the improvements from or "dispossessing" Plaintiffs' use and control of the Disputed ROW.  *See* ECF No. [31] at 19.  They allege the Village "failed to assert its putative rights" to the Platted ROW and the Disputed ROW despite knowing of Plaintiffs' open and notorious use of the Disputed ROW.  *See* ECF No. [31] at 18.  Because of that failure, the Village "acquiesced to" and "tacitly, if not expressly, consented to" Plaintiffs' use of the Disputed ROW. *See* ECF No. [31] at 18.  Plaintiffs allege they continued to possess and use the Disputed ROW in reliance on the Village's inaction, approval, and acquiescence and "would not have added to" and maintained the improvements "but for" that inaction, approval, and acquiescence.  *See* ECF No. [31] at 18.

By allegation, this claim diverges the farthest from the claims and issues litigated or available in the 2001 Lawsuit.  *See generally* ECF No. [32-1].  Indeed, like their Constructive Abandonment claim, Plaintiffs argue their Unenforceability claim is "based on facts occurring after the conclusion of the 2001" Lawsuit.  *See* ECF No. [33] at 14.  But though Plaintiffs' Unenforceability claim describes their desired result from the Village's alleged inaction in terms of waiver and estoppel, in context those terms mean the same thing as abandonment: Plaintiffs allege that the Village knew about their "activities" on the Disputed ROW and did not stop them, which amounts to tacit consent of Plaintiffs' improvements and use and to implicit abandonment of the Village's own rights to use and control the Disputed ROW.  *See* ECF No. [31] at 18–19. Essentially, Plaintiffs attempt to assert a claim that they adversely possessed the Disputed ROW. *See, e.g.*, Fla. Stat. § 95.16; Fla. Stat. § 95.18; *Milton v. Corrie*, No. 16-CV-62590, 2017 WL 2214756, at *3 (S.D. Fla. May 18, 2017); *Seton v. Swann*, 650 So. 2d 35, 36 (Fla. 1995); *Meyer v.*

*Law*, 287 So. 2d 37, 40–41 (Fla. 1973).

No matter what words Plaintiffs choose to describe their intended result, however, it will not change the applicable law. And that law makes clear the Village cannot abandon — or waive, or be estopped from using — its or the public's rights to any waterfront right of way in Monroe County. *See* Monroe Cnty. Code § 19-1(b)(1). With good reason: as the other subsections of § 19-1(b) illuminate, the purpose behind the no-abandonment rule is to preserve the public's ability to access open water. *See* Monroe Cnty. Code § 19-1(b)(2)–(3) (noting that no "dedicated and accepted right-of-way in the county shall be abandoned where" the right of way "provides access to the public to land on open water" or the "abandonment would preclude a way for the public to maintain access to the water"). So while the Village may not have enforced its rights to the Disputed ROW until many years after Plaintiffs had made improvements to it, *see* ECF No. [31] at 18–19, and while in some instances parties may be able to apply "for the abandonment of public rights-of-way," *see generally* Monroe Cnty. Code § 19-1, or establish that they have adversely possessed municipal land, Plaintiffs cannot acquire title to the Disputed ROW through abandonment, whether they call it that or something else, *see id.* § 19-1(b)(1).

For that reason, it does not matter that Plaintiffs' Unenforceability claim is "based on facts occurring after the conclusion of the 2001" Lawsuit. *See* ECF No. [33] at 14. Again, the Circuit Court's determination that the Disputed ROW cannot be abandoned was based on law, not facts. *See* ECF No. [32-1] at 7 n.6. And that determination resolves the issues in Plaintiffs' Unenforceability claim because if the Disputed ROW cannot be abandoned, it also cannot be waived. Nor can the Village be estopped from protecting its and the public's rights to the Disputed ROW.

That means, like the rest of Plaintiffs' declaratory judgment claims, the issues raised in

their Unenforceability claim were resolved by an issue that was litigated (or, at minimum could have been litigated) during the 2001 Lawsuit.  Because Plaintiffs' Unenforceability claim (Count VI) is identical, as that term is defined in the preclusion context, claim preclusion bars it.  *See Brown*, 611 F.3d at 1332; *Douglas*, 110 So. 3d at 425; *Palm AFC Holdings*, 807 So. 2d at 704.  Similarly, because "the litigated issue was a critical and necessary part of the" 2001 Lawsuit, issue preclusion also bars Plaintiffs' Unenforceability claim (Count VI).  *See Wingard*, 438 F.3d at 1293; *Brown*, 611 F.3d at 1332.  Accordingly, the Motion, **ECF No. [32]**, is **GRANTED as to Count VI**, which is **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

For the reasons discussed above, the Motion, **ECF No. [32]**, is **GRANTED in part and DENIED in part**.  Specifically:

1.  Counts I–III are **DISMISSED WITHOUT PREJUDICE**.  If Plaintiffs can in good faith amend the Second Amended Complaint to include *Monell* allegations or additional detail about their constitutional claims, they must do so **no later than July 26, 2025**; and

2.  Counts IV–VIII are **DISMISSED WITH PREJUDICE**.

**DONE AND ORDERED** in Chambers in Miami, Florida on July 11, 2025.

_____
**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:    All Counsel of Record